Dore, J.
Plaintiff sued to recover $50,000, the face value of a policy of life insurance issued by defendant on the life of one Jacob S. Cohen, president of plaintiff, a Rhode Island corporation, on whose application the policy had been issued. At trial the only contested issues related to the insurer’s defense of suicide on which defendant had the burden of proof. The relevant clause in the policy reads as follows: “ 5. Suicide: — If the Insured, within two years from the date of issue hereof, *402 die by his own hand or act, whether sane or insane, the liability of the Company hereunder shall be limited to an amount equal to the premiums which have been received, without interest.”
It is conceded that the insured had been afflicted for some time with a severe and persistent skin disease which was unsightly, painful and irritating, covered practically his whole body and did riot respond to treatment. After he became so afflicted,' he went from doctor to doctor and hospital to hospital seeking relief in vain. In July, 1943, in the Beth Israel Hospital, Boston, Mass., \t?hichhe had entered in an effort to cure the skin disease, he was found to be an extremely apprehensive, emotionally unstable person, irritable. and frightened and reacting poorly to his skin disease.
On the issue of suicidal intent, the evidence overwhelmingly establishes an • intent on the part of the insured, within two years- from the date of the policy, to take his life by inhaling cooking gas, carbon monoxide, in his apartment in Providence, R. I., on the morning of August 9, 1943. On that day, about 11:30 a.m., he was found sitting on a chair slouched over the gas stove in the ■ kitchen of his home, the kitchen door being closed, with his face on the stove and all the gas cocks wide open, including that which supplied the oven, the door of. which was also open. The gas cocks'for the separate burners were inset so as to prevent accidental turning on. The insured was unconscious and remained so for about twenty-four hours. He was taken, from the stove, first aid was administered and an inhalator used. Doctor Flynn, a graduate of .Yale University School of Medicine,, came from the Rhode Island Hospital to the house, continued to administer the first aid in an effort to resuscitate the insured, and then took him, unconscious and of a deep cyanotic color, to-the Rhode Island Hospital where oxygen was administered for about twenty-four hours. The doctor also gave the insured a blood transfusion on August 9th at 3 :00 p.m.
As the insured had suffered from retention of urine for nearly thirty hours, Doctor Flynn catheterized the patient at 5:00 p.m. on August 10th, taking from the bladder in a period of about ten minutes 900 ce of ‘ ‘ very dark, blue black smoky urine. ” On August 11th and 12th by catheterization a much smaller amount of fluid was withdrawn. On August 13th the insured was transported by train and ambulance to the Post Graduate Hospital in.New York and catheterized a number of times. He died there on August 19, 1943. Both parties agree that the cause of death ultimately was uremia poisoning due to anuria or the failure of the kidneys to function.
*403 The issues for the jury were (1) whether the insured inhaled the gas with suicidal intent; and (2) if he did, whether the condition resulting in death was caused by the carbon monoxide poisoning from inhaling the gas, as defendant contended; or whether it was caused by the catheterization on August 10th in the Ehode Island Hospital, as plaintiff contended. For the respective claims, five expert witnesses testified on each side.
No special issue on the important question of suicidal intent was submitted to the jury, but the question of such intent was generally submitted as well as the conflicting medical testimony as to the cause of the condition producing death.
Plaintiff’s contention was that the catheterization on August 10th was improper medical treatment because it was done too swiftly and by reason of the long retention and the sudden emptying of the bladder the catheterization caused a kidney “ shut down ” which caused the anuria and the uremia, the final cause of death. Plaintiff’s experts contended that under the circumstances the catheterization should have been over a long period of time; one of plaintiff’s doctors testified to a period of twenty-four hours. In short plaintiff claimed that the catheterization and not the gas killed the insured.
Defendant’s doctors testified that the catheterization was not the cause of death, that it was proper medical practice under the circumstances as the patient did not have prostatitis or chronic bladder obstruction or chronic retention, and that the death was caused by acute carbon monoxide poisoning resulting in a shut down or blockage of the kidneys thus causing the anuria and uremia.
The issues raised by the conflicting testimony of the medical experts as to the cause of the anuria and uremia were issues of fact for the jury and were so submitted by the court in the charge. The charge, however, was unnecessarily repetitious in plaintiff’s case; thus the court charged six separate times the conditions under which the jury must find in favor of plaintiff, the charges being frequently a repetition of previous charges, cumulative and unnecessary.
Defendant contends that, as there was so much testimony in the record with regard to the transfusion and its effects, the court should have charged on such issue and that, by not doing so, the court withdrew from the jury’s determination important issues presented by the evidence. Defendant further contends that the verdict was against the weight of the credible evidence; that if the insured had not been catheterized, plaintiff would contend that such failure to relieve him of prolonged *404 retention was the cause of death; and that the charge- was erroneous in instructing the jury in part with regard to “ improper treatment ” without specifying what such improper treatment was.
Both sides agree .that the rule applicable to torts does not here apply; viz., the rule that the author of a wrongful act is held for all resulting damages even though the- consequences of the act are aggravated by subsequent intervening acts, such as malpractice. On this aspect of the case, the problem is the interpretation of the contract and the inquiry is how far the parties intended to go. Defendant concedes that it cannot support its defense if an intervening act of malpractice directly caused the insured’s death, but urges that, the effect of the inhaling of the carbon monoxide was not broken if the treatment given in an effort to save the insured was proper medical practice and not contra indicated or malpractice.
It cannot seriously be contended that the parties to the contract when it was made did not contemplate that in the event of attempted suicide, therapeutic measures should not be taken to save or resuscitate the insured. If the insured took gas' with suicidal intent and thereafter proper therapeutic measures and treatments according to accepted medical practice were employed to save his life, but in spite of such measures he died, insurer would not be liable as in such case the intentional act of inhaling the gas proximately caused the death. If, however, the treatment was not accepted medical practice, but contra indicated or malpractice proximately causing conditions resulting in death, then the insured did not die by his own act and plaintiff should recover. To be an efficient intervening cause, the medical treatment must be not in accordance with accepted medical practice and to have in and of itself produced the conditions that immediately caused the death. The court should have so charged.
Both sides litigated at some length the question of the transfusion reaction and even if the court was not obligated to grant the requests as made in this connection, at least the court should have submitted to the jury whether it was accepted medical practice under the circumstances to give the transfusion in question and whether it caused or contributed to cause the death. The failure to mention transfusion in the charge added-to the confusion by reason of the frequent reference therein to “ improper ” medical practice as the cause of death without specifying in a number of such instances what precise- improper medical practice was meant -
*405 On the issue of suicidal intent, the evidence, as above indicated, is such that any verdict for plaintiff on such issue would necessarily have to be set aside; as a matter of law it could not stand without substantial evidence to support it (Bank of United States v. Manheim, 264 N. Y. 45, 51). On retrial the issue of suicidal intent should be submitted to the jury as a separate and special issue so as to enable the court properly to determine if any verdict on such, issue is supported by the evidence.
This case was unique and exceptional and presented extremely difficult problems to the trial court. For the reasons indicated, however, we think the judgment appealed from should be reversed- and a new trial ordered.
Defendant’s motion to set aside the verdict and grant a new trial brings up the whole record for review on this appeal and the court may, even though some of the errors were not presented by exceptions, award a new trial (Swift v. Poole, 172 App. Div. 10, 13; Zeffiro v. Porfido, 265 App. Div. 185, 186; Civ. Prac. Act, §§ 580, 583).
The judgment appealed from should be reversed and a new trial ordered, with costs to the appellant to abide the event.
Callahan, J., concurs; Cohn, J., concurs in result; Glen-non, J., dissents and votes to affirm.
Judgment reversed and a new trial ordered, with costs to the appellant to abide the event.